NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| OPTICA, INC., | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 03-5065 |
| | : | |
| METRO PUBLIC ADJUSTMENT, INC., | : | |
| TRAVELERS INDEMNITY COMPANY | : | |
| OF AMERICA, *et al.*, | : | |
| Defendants, | : | **OPINION** |
| | : | |
| | : | |
| | : | |

This matter is before the Court on Defendants The Traveler's Indemnity Company of America ("Travelers") and Metro Public Adjustment, Inc. ("Metro"), Daniel M. Young ("Young"), and Robert DeCecco ("DeCecco") (collectively the"Metro Defendants") individual motions for summary judgment, and Plaintiff Optica, Inc.'s ("Optica") cross-motion for summary judgment as against Travelers.  For the reasons discussed herein, summary judgment will be granted as to all claims against Travelers, and Optica's cross-motion for summary judgment will be denied.  Metro's motion for summary judgment will be granted in-part and denied in-part.

### I.  Factual Background

### A.     Actions after the loss

This litigation concerns the coverage of Travelers Property Casualty insurance under Policy No. I-680-950H8581-TIA-02, which was issued on October 31, 2002.

(Compl. ¶ 3.)  Optica is a photo developing and photo supply store located in Cinnaminson, New Jersey.  (Id. at 1.)  Gregory Leomporra ("Leomporra") is the president of Optica.  On or about September 17, 2002, Leomporra discovered that a photographic developing  machine inside Optica's store had malfunctioned and running waste water flooded the business premises with water and chemicals.  (Id. ¶ 4.)  Travelers contacted Leomporra about five days after the loss was reported.  (Leomp. Dep. 10/19/04 at 50.)  Travelers Claims Notes state that after a physical inspection of the site, it discovered a "crimp in the insured's drain line for unit [developing machine].  Insured had installed this line himself."  (Travelers Exh. F at 2.)

    After the loss was reported to Travelers, Travelers retained and paid ServPro, a restoration company, to remove the water, dry out the store, and remove the water-damaged carpet.  Leomporra's testimony and the ServPro Invoice (Travelers Exh. C) indicate that these tasks were complete in early October 2002.  (Leomp. Dep. 10/19/04 at 64.)  The October 18, 2002 ServPro Invoice stated that the remediation occurred on September 24, 2002, and under the heading DAMAGE NOTES:

> There was visible mold growth on the wall in the Studio Room and also in the Dark Room. . . . He [Leomporra] instructed us [ServPro] that he would make arrangements with his insurance company to have the shelves dismantled and machinery moved in order for the drywall to be removed. *ServPro informed Mr. Leomporra when he is ready we would return to due [sic] any mitigation [sic] necessary*.  Any Questions Please Call Me.

(Travelers Exh. D.) (emphasis added)  Later, Travelers Claim Notes dated April 2, 2003, recorded that ServPro did not do the initial cleanup properly, and that exacerbated the

mold problem.  (Travelers, Exh. F. at 6.)  Yet, the record does not indicate that Optica ever contacted ServPro, or any another vendor, for mitigation services for several months despite the "visible mold growth" reported in late September 2002.

On October 16, 2002, Leomporra testified that Travelers paid Optica a $5000.00 advance pending the adjustment of its property damage claim.  In a letter dated October 26, 2002, Leomporra sent Optica's property damage claim.  (Travelers Exh. D.)  This was a list of damaged store items totaling $9,783.84.  (Id.)  The letter was addressed to Bill McNellis and stated in pertinent part:

> I was pleased to know that I can fix the darkroom in January or February when we slow down.  I want to take care of the things we can do without shutting me down. . . . I also have two machines that have rusted on the bottom and are not currently functioning what do I do. . . .

(Id.)  On November 1, 2002, Travelers paid to Optica an additional $4,283.84 ($9,783.84 less $5000, and less a $500 deductible).  (Leomp. Dep. 10/19/04 at 60.)

On January 22, 2003, Travelers paid Optica an advance of $6,910.21 to allegedly make the required repairs.  (See Travelers Br. at 5.)  Traveler's Claim Notes indicate that by early February, Travelers and Leomporra became aware that mold had infested the entire store.  (Travelers, Exh. F at 3.)  On February 5, 2003, after an inspection, Travelers wrote Leomporra to inform him that there was mold present in his store and that it must be remediated and tested.  (Travelers, Exh. F at 4.)

On or about February 12, 2003, Optica entered into a contract with Metro to serve as an adjuster in its preparation of its insurance claim.  (Compl. at 5.)  The Public

Adjuster Retainer Agreement states that, "[Optica] engages Metro to advise and assist in the adjustment of an insurance claim." (Metro, Exh. H.) The contract included an unspecified retainer with a right to cancel within three (3) business days. (Id.) Metro was to be compensated based upon a percentage of the overall insurance settlement received by Optica. (Id.) Optica dealt with Metro's adjuster Robert DeCecco ("DeCecco"), who the day after the contract was signed, retained TTI Environmental, Inc. ("TTI") because he suspected a microbial infestation. (1/26/05 DeCecco Dep. at 33-34.)

Travelers' Claim Notes indicate that during spring of 2003 Travelers requested several mold tests and attempted to ascertain the cost of remediation and repair. (Travelers, Exh. F at 7-8.) Nicholas Kaz ("Kaz") was the Travelers Adjuster who was handling Optica's claim at this time. Sometime in April, it was determined that in order to clean up the store Optica would have to relocate; thus, Travelers began looking for alternative locations. (Id. at 8.) Additionally, Travelers asked Optica for an estimate of the cost to remove, clean, and reinstall the photographic machines, a list of damaged contents, and a complete estimate for the repair of the store. (Id.) On April 9, 2003, Kaz, DeCecco, and Leomporra attended a meeting at the Optica store. Following the meeting, DeCecco forwarded a letter to Travelers, copying Optica, which confirmed certain requests made by Kaz.

On or about April 16, 2003, Travelers advanced another $15,000 to Optica. (Id.) Optica informed DeCecco of the overall costs estimates, which was memorialized in a

4

May 16, 2003 letter to Kaz. (Travelers Exh. I.)  Nevertheless, Kaz testified that the form

of Optica's estimates was incorrect because they were not broken down into line item

costs, which is the "standard in the industry." (12/22/04 Kaz Dep. at 171-172.)  DeCecco

testified that he called Kaz on May 27 to confirm his receipt of the May 16th letter,

however, DeCecco was told that the letter had not yet been filed.  (Id. at 88.)  DeCecco

submitted these estimates, and was later advised by Travelers that they were useless.

(1/26/05 DeCecco Dep. at 55.)

The parties' submissions indicate that the months of June and July 2003 created

great confusion among the parties and the relationships began to deteriorate.  During this

period, Optica enlisted its own contractor, Bercon Builders; presumably, this change was

made because Optica was dissatisfied with Travelers' contractor.  Also, Frank Hartmann

("Hartmann") replaced Kaz at Travelers since Kaz left the firm.  On June 3, 2002,

Hartman met with DeCecco and Leomporra at the Optica store.  Travelers agreed to pay a

six month rental expense for a temporary location and advanced $30,000 for the purposes

of leasing this space.  (Travelers Exh. F at 16.)  After the meeting, DeCecco prepared a

June 9, 2003 letter to Leomporra which summarized the information that was still needed

by Travelers.  (Metro Exh. P.)  On June 9, DeCecco wrote to TTI to obtain information

from the environmental report to give to Travelers.  (Metro, Exh. Q.)  On June 18, 2003,

Hartmann wrote a letter to DeCecco demanding a list of documents from Optica.

(Travelers Exh. K.)  On June 20, 2003, DeCecco wrote to Leomporra advising him that

building estimates should utilize line item pricing and reflect linear and square footage

costs of all materials.  (Metro, Exh. S, T.)

On July 8, 2003 Metro submitted a revised building estimate from Bercon to

Travelers.  (Metro, Exh. S, T.)  The next day, Travelers wrote to Metro and indicated that

it did not accept the building estimate because it did not provide sufficient details.

(Metro, Exh. U.)  Metro's vice-president, Daniel Young ("Young") stated it was not his

policy to deal directly with the insured's contractor because Metro had no authorization or

right to interfere in the contractual relationship between Optica and Bercon.  (1/26/05

Young Dep. at 158.)  Young stated that interference with a contractor hired by a client is

not within the normal public adjusting procedure.  (Id. at 159.)

On July 11, 2003, Travelers advanced another $30,000 for the purposes of leasing

another space. (Travelers Exh. F at 16; 12/22/04 Hartmann Dep. at 11.)  Leomporra

testified that these advances were used to pay for the day-to-day business expenses of

Optica.  (10/19/04 Leomp. Dep. at 100, 131, 132, 184.)  On June 18, 2003, Hartmann

wrote another letter to Metro that requested numerous documents.  (Travelers Exh. K.)

Hartmann's testimony, and Traveler's Claim Notes indicate that Travelers advanced

Optica another $10,000 and agreed to pay nine months rent for a temporary location.

(Travelers Exh. F at 20-21; 12/22/04 Hartmann Dep. at 20.)  Leomporra used these funds,

and the previously paid funds, to pay for the day-to-day operating expenses of Optica.

(10/19/04 Leomp. Dep. at 100.)

Sometime in July 2003, Leomporra requested an additional $30,000 advance to pay six (6) months rent and to pay an architect. (Travelers Exh. F at 23.) At Leomporra's request, a meeting was held on July 22, 2003, at the Optica store that included Hartman and Young. Metro wrote Travelers on July 28, 2003, to memorialize the conversations of the July 22 meeting, requested an additional $50,000 advance, and expressed concerns about the tests and inspections on the property. (Metro, Exh. W.) On July 30, 2003, Travelers advanced $50,000 to Optica and indicated that they would reimburse the expense of moving the store's equipment to the temporary location. (Id. at 24.) Travelers retained Callaghan Nawrocki, LLP, forensic accountants, who on July 29, 2003 wrote to DeCecco requesting a list of certain documents from Optica; namely, complete federal business income tax returns from 1998 through 2002, monthly profit and loss statements from September 1998 through the present, and a detailed general ledger from September 1998 to the present. (Metro, Exh. X.) Leomporra testified that he did not allow the forensic accountants to inspect his books. (10/19/04 Leomp. Dep. at 189, 1/26/05 Leomp. Dep. at 40-41.) Nor, did Leomporra supply these documents to Travelers, or submit them now in support of its cross-motion for summary judgment against Travelers.

Pursuant to the terms of the policy, Travelers conveyed to Leomporra a desire to inspect the store with a building consultant and environmentalist. (Ins. Policy at 0000030-31.) Leomporra testified that he informed Metro that he did not want to work with DeCecco because he was unhappy with his representation. In a letter dated July 31,

7

2003, Young advised Leomporra that Travelers had the right under the terms of the policy to inspect the premises using an inspector of its choosing.  (See Travelers, Exh. L.)  The letter also discussed Leomporra's desire to reschedule the inspection.  (See id.)  Travelers alleges that Leomporra refused to allow the inspections, to which Leomporra testified that he was "massively pissed off" and he refused to allow the inspection.  (10/19/04 Leomp. Dep. at 200-201.)  Sometime in August 2003, Leomporra attempted to discharge Metro. (Id. at 211; Metro Exh. GG.)

On September 29, 2003, Optica filed suit against Travelers, Metro, Young and DeCecco.  To date, Travelers has paid Optica $122,596.64.  (See Travelers, Exh. M.) Travelers claims that Leomporra did not use any of the money to remediate or repair the damage to the store, and has not demonstrated any loss of business income or expenses under the terms of the policy.  (Travelers Br. at 11.)  Optica states that the reason for this lawsuit is that "Travelers deliberately delayed payment and deliberately withheld approvals that were necessary for Optica to make the move and repairs compelled by the loss/mold."  (Optica Br. at 5.)  Optica contends that Travelers' motive in the delay of payment and approvals was to avoid paying "business interruption" benefits, which allegedly expired one year after the loss.[1]  Optica states that Traveler's did not give approval for the relocation until July 2003; that is, ten months after the loss.  (Id. at 6.) This is due, in part, to three different adjusters at Travelers who would start "all over

---

[1]  Optica uses the term "business interruption" period, which essentially means the same thing as the "period of restoration."  See discussion Part I.B., infra.

from the beginning" each time it dealt with the Optica claim.  (Id.)  Because Travelers did not require a specific format for the expense statements, it argues that its requests for reimbursements was sufficient.  (Id. at 7.)  Optica claims that Travelers delay in approving its move to an advantageous space in the same shopping center caused it to lose out on that deal.  (Id.)  Because of its equipment, renovations were required at any new space; thus, landlords demanded a full years rent up-front.  (Id. at 8.)  Optica states that the total costs of the move, repairs, and renovations totaled $330,990.  (See Leomporra Affidavit ¶ 52.)  This claim does not account for the advances made by Travelers.  In addition, Optica has not proffered an expert opinion on how the conduct of the Metro Defendants fell below an established standard of care applicable to other insurance adjuster professionals.

## B.     Terms of the Policy

The policy limits the coverage to $311,472.  (Ins. Policy at 0000000.)  The Policy provides in pertinent part:

> In the event of loss or damage covered by this Coverage Form, at our option, we will either:
>     (1) Pay the value of lost or damaged property;
>     (2) Pay the cost of repairing or replacing the lost or damaged property, subject to b. below;
>     (3) Take all or any part of the property at an agreed or appraised value; or
>     (4) Repair, rebuild or replace the property with other property of like kind and quality, subject to b. below. . . .

The Policy provides, subject to its other terms, conditions, limitations, and

exclusions for the payment of the:

> actual loss of Business Income you sustain due to the necessary
> `suspension' of your `operations' during the `period of restoration'.  The
> `suspension' must be caused by direct physical loss of or damage to
> property at the described premises.

(Ins. Policy at 0000012.)  Business Income is defined as follows:

> a. Business Income means the:
>
> (1) Net Income (Net Profit or Loss before income taxes) that would have
> been earned or incurred;
> (2) Continuing normal operating expenses incurred, including payroll;
> (3) Includes "Rental Value"; and
> (4) Includes "Maintenance Fees" if you are a condominium association.

(Id. at 0000013.)  The Policy also covers Extra Expenses, pursuant to the following

coverage provision:

> We will pay the necessary and reasonable Extra Expenses you incur during
> the "period of restoration" that you would not have incurred if there had
> been no direct physical loss of or damage to property at the premises
> described in the Declarations. The loss or damage must be caused by or
> result from a Covered Cause of Loss.
> * * *
> (2) Extra Expense means expense incurred: (a) to avoid or minimize the
> "suspension" of business and to continue "operations": (i) at the described
> premises; or (ii) at replacement premises or at the temporary locations,
> including relocating expenses and costs to equip and operate the
> replacement or temporary locations...to the extent it reduces the amount of
> loss that otherwise would have been payable under Business Income.

(Id. at 0000018.)  To be insured, the actual loss of Business Income or Extra Expense

must be sustained during the "period of restoration" defined as the period of time

necessary to repair, rebuild or replace the damaged property with reasonable speed and

10

similar quality.  (Id. at 0000014 and 18.)  The Policy extends coverage for a reasonable

actual loss of business income for up to an additional 60 days, but not for Extra Expense

that extends beyond the "period of restoration."  The Policy further limits both Business

Income and Extra Expense coverage to the period occurring within 12 consecutive

months immediately following the date of the direct physical loss or damage.  (Id.)

Travelers argues that Optica has not provided any proofs to establish a cognizable

claim for loss of Business Income or Extra Expenses under the Policy.  In Travelers'

Interrogatories, Question 11, Optica was asked to

> State in detail all information and documentation plaintiff provided to
> Travelers Indemnity Company of America as of September 17, 2003, with
> regard to its claim of loss of business income and extra expense.

(Travelers, Exh. O.)  Optica answered, "Objection. Question is ambiguous.  Without

waiving: see correspondence previously stated."  (Id.)   The Policy sets forth how

Business Income and Extra Expense is calculated:

> a. The amount of Business Income Loss will be determined based on:
>
> (1) The Net Income of the business before the direct physical loss or
> damage occurred;
> (2) The likely Net Income of the business if no physical loss or damage
> occurred, but not including any likely increase in Net Income attributable to
> an increase in the volume of
> business as a result of favorable business conditions caused by the impact of
> the Covered Cause of Loss on customers or on other businesses;
> (3) The operating expenses, including payroll expenses, necessary to
> resume "operations" with the same quality of service that existed just before
> the direct physical loss or damage; and
> (4) Other relevant sources of information, including:
> > (a) Your financial record and accounting procedures;

(b) Bills, invoices and other vouchers; and
(c) Deeds, liens or contracts.

b. The amount of Extra Expense will be determined based on:

(1) All reasonable and necessary expenses that exceed the normal operating
expenses that would have been incurred by "operations" during the "period
of restoration" if no direct physical loss or damage had occurred. We will
deduct from the total of such expenses:
    (a) The salvage value that remains of any property bought for
    temporary use during the "period of restoration", once "operations"
    are resumed; and
    (b) Any Extra Expense that is paid for by other insurance, except for
    insurance that is written subject to the same plan, terms conditions
    and provisions as this insurance; and
(2) All reasonable and necessary expenses that reduce the Business Income
loss that otherwise would have been incurred.

(Ins. Policy at 0000033-34.)  Another important clause in the policy is the "Duties in the

Event of a Loss" section, which states in pertinent part:

a.  You must see to it that the following are done upon the discovery of loss
or damage, or a situation that may lead to loss or damage, to Covered
Property:
    * * *
    (4) Take all reasonable steps to protect the Covered Property from
    further damage, and keep a record of your expenses necessary to
    protect the Covered Property, for consideration in settlement of the
    claim. . . .
    (5) at our request, give us complete inventories of the damaged and
    undamaged property.  Include quantities, costs, values and amount of
    loss claimed. . . .
    (6) As often as may be reasonably required, permit us to inspect the
    property proving the loss or damage and examine your books and
    records.
    * * *
    (9) Cooperate with us in the investigation and settlement of the
    claim.
    (10) If you intend to continue your business, you must resume all or

12

part of your "operations" as quickly as possible.

(Id. at 0000030.)  Also, the Policy contains a "Neglect" exclusion, which states:

> B. EXCLUSIONS
> 1.  We will not pay for loss or damage caused directly or indirectly by any
> of the following.  Such loss or damage is excluded regardless of any other
> cause or event that contributes concurrently or in any sequence to the loss.
> * * *
> h.  Neglect.
> Neglect of an insured to use reasonable means to save and preserve property from
> further damage at and after the time of loss.

(Id. at 0000027.)

The critical issue at this juncture in the litigation is whether Optica can sustain a claim under the policy when there are no records that substantiate a claim for business income and extra expenses during the relevant time period.  Leomporra testified that Optica has not filed a business income tax return since 1999 (10/19/04 Leomp. Dep. at 30-31), and that he refused to send the 1998 return to Travelers.  (Id. at 189.)  Also, Optica did not maintain a monthly accounting log, or some other indicia of profits.  (Id. at 90.) Nor, did Optica maintain a general ledger or inventory list.  (Id.)  Travelers argues that a reasonable jury could not conclude that Optica sustained an actual loss of business income, or incurred extra expenses during the twelve months following September 17, 2002.

The submissions also give some, but not complete, insight into the contentiousness of the pre-litigation conduct of the parties.  No doubt, several phone conversations and in-person meetings could add greater clarity to the expectations, understandings, and

13

assurances of all involved.  Partially to blame, for what was otherwise a routine insurance claim, was the number of individuals who were involved in Optica's claim, three at Travelers (McNellis, Kaz, Hartmann) and two at Metro (DeCecco, Young), which due to turnover and/or personality clashes, created a breakdown of communication.  Further complicating the resolution of this issue is the myriad of contractors and remediation specialists, each of whom were answerable to their respective client.  This Opinion and accompanying Order, however, rests only on the submissions to the Court.

## II.  Standard for Summary Judgment

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (c).  Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In determining whether a

14

genuine issue of material fact exists, the court must view the facts and all reasonable

inferences drawn from those facts in the light most favorable to the nonmoving party.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a

genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once

the moving party has met this burden, the nonmoving party must identify, by affidavits or

otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum

v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a

properly supported motion for summary judgment, the nonmoving party must identify

specific facts and affirmative evidence that contradict those offered by the moving party.

Andersen, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon mere allegations,

general denials or . . . vague statements . . . .'"  Trap Rock Indus., Inc. v. Local 825, Int'l

Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro,

Inc., 934 F.2d 497, 500 (3d Cir. 1991)).

Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment,
> after adequate time for discovery and upon motion, against a party who fails
> to make a showing sufficient to establish the existence of an element
> essential to that party's case, and on which that party will bear the burden of
> proof at trial.

Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). Credibility determinations are the province of the fact finder. <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992). Moreover, the standard by which the court decides a summary judgment motion does not change when the parties file cross-motions. <u>Weissman v. United States Postal Serv.</u>, 19 F. Supp. 2d 254 (D.N.J. 1998). When ruling on cross-motions for summary judgment, the court must consider the motions independently, <u>Williams v. Philadelphia House Auth.</u>, 834 F. Supp. 794, 797 (E.D. Pa. 1993), <u>aff'd</u>, 27 F.3d 560 (3d Cir. 1994), and view the evidence on each motion in the light most favorable to the party opposing the motion. <u>See</u> <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587. Optica has filed a cross-motion for summary judgment only against Travelers.

### III.  Analysis

The Court must apply the forum state's choice of law rule. <u>General Star Nat. Ins. Co. v. Liberty Mut. Ins. Co.</u>, 960 F.2d 377, 379 (3d Cir. 1992) (citation omitted). With respect to insurance contract disputes such as this, the New Jersey Supreme Court has held that "the law of the place of the contract will govern the determination of the rights and liabilities of the parties." <u>State Farm Mut. Auto. Ins. Co. v. Simmons Estate</u>, 417 A.2d 488 (N.J. 1980).

### A.    Claims against Travelers

### 1. Claims of Loss

This litigation concerns three potential policy claims: Business Personal Property Claim, Business Income Claim, and Extra Expense Claim.

The record is void of evidence indicating that Leomporra was forbidden from relocating the store because he had not received authorization to do so from Travelers. DeCecco's testimony supports this principle; namely, that receiving more advance payments was not contingent on whether it stayed or immediately moved.  (1/26/05 DeCecco Dep. at 52.)  On or about April 28, 2003, DeCecco wrote to Leomporra requesting that he provide documentation regarding the use of a temporary location.  (See Metro Exh. L.)  The record indicates that negotiations with his current landlord fell apart; however, it is also apparent that Leomporra did not enlist a real estate agent, confined his real estate search to only Cinnaminson, and would not consider longer-term leases. (10/19/04 Leomp. Dep. at 108-22; 187-188)  Furthermore, beginning in June 2003, and after already advancing Optica $30,000, Travelers started making advances to Optica that were meant to cover rent at a temporary location.  It is undisputed that as of July 30, 2003, no remedial work was undertaken on the store, nor had a temporary lease been secured.  Understandably, Travelers ceased making payments, although it had sent $90,000 in June and July 2003, once it became apparent that these monies were not being used to limit Travelers' or Optica's exposure.

17

The relationship between the parties had significantly deteriorated by July 2003. Metro had scheduled an inspection by Travelers for August 1, 2003.  Over Metro's advice that Travelers had the right to inspect the store, and that Leomporra's refusal would constitute a breach of the Insurance Policy, Leomporra nonetheless refused to let the inspection to go forward.  (10/19/04 Leomp. Dep. at 197,203-204; Travelers' Exh. M.)

### a.  Business Personal Property Claim

Not until this litigation began, and upon a request for discovery, was Travelers permitted to inspect the store.  Traveler's building inspector, Douglas MacKinney, estimated that the complete remediation would cost $63,153.60 and that a reasonable architectural fee associated with the work would be $1500.  (Traveler's Exh. N.)  Optica's estimate far surpasses these figures.  (See Leomporra Affidavit ¶ 52.)

Optica has failed to substantiate a claim for business personal property loss under the Policy because its loss would come in at just over half of the $122,596.64 that Travelers had already paid in advances.  Also, the delay caused by Leomporra's refusal to allow inspectors access to the store likely made the remediation costs higher. Importantly, the Policy required that the insured take all reasonable steps to protect the property from further damage (See "Duties in the Event of a Loss" ¶ 4, at 0000030), and permit as often as necessary the insurer the ability to inspect the property (id. ¶ 9.). Moreover, the Policy excludes "neglect of an insured to use reasonable means to save and preserve property from further damage at and after time of loss."  (Ins. Policy at

0000027.)  The duties and the exclusions are sufficient themselves to provide a bases for

granting Traveler's motion for summary judgment.

It will be determined below that Optica has failed to proffer evidence of business

income or extra expense loss incurred during the period of restoration.  Or stated

differently, the advances could not have been made for a business income or extra

expense because these expenses had not yet "incurred."  As such, the $122,596.64 must

necessarily cover the business personal property claim.  Since Optica has not

demonstrated a loss above what it has already been advanced there exists no genuine

issue of material fact as to a business personal property claim.  As such, summary

judgement will be denied as to Optica, but granted as to Travelers on this claim.

        b.  Business Income Claim

Optica neither submitted a loss of business claim to Travelers that incurred during

the period of restoration, (Travelers' Reply at 8), nor has it responded to Travelers'

discovery requests concerning the basis for a business income loss claim (see Optica's

Responses to Requests for Documents Nos. 11, 12, 13).  Before this litigation ensued,

Travelers retained Callaghan Nawrocki, LLP, forensic accountants, who on July 29, 2003

wrote to DeCecco requesting a list of certain documents from Optica; namely, complete

federal business income tax returns from 1998 through 2002, monthly profit and loss

statements from September 1998 through the present, and a detailed general ledger from

September 1998 to the present.  (Metro, Exh. X.)  Quite likely, an insurer initiates these

19

activities to better ascertain its business income exposure, and then, pay the insured what is owed.  Leomporra testified that he did not allow the forensic accounts to inspect his books.  (10/19/2004 Leomp. Dep. at 189,1/26/05 Leomp. Dep. at 40-41.)

Leomporra testified that Optica has not filed a business income tax return since 1999 (10/19/04 Leomp. Dep. at 30-31), and that he refused to send the 1998 return to Travelers.  (Id. at 189.)  Also, Optica did not maintain a monthly accounting log, or some other indicia of profits.  (Id. at 90.)  Nor, did Optica maintain a general ledger or inventory list.  (Id.)  The policy states that the amount of Business Income Loss will be determined based on:

> (1) The Net Income of the business before the direct physical loss or damage occurred;
> (2) The likely Net Income of the business if no physical loss or damage occurred, but not including any likely increase in Net Income attributable to an increase in the volume of
> business as a result of favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;
> (3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and
> (4) Other relevant sources of information, including:
>> (a) Your financial record and accounting procedures;
>> (b) Bills, invoices and other vouchers; and
>> (c) Deeds, liens or contracts.

The policy places a limit on actual business income loss during the "period of restoration, not to exceed twelve (12) consecutive months.[2]  Thus, the record indicates

---

[2]  To be insured, the actual loss of Business Income or Extra Expense must be sustained during the "period of restoration" defined as the period of time necessary to repair, rebuild or replace the damaged property with reasonable speed and similar

that Optica was in breach of the duties to provide the amount of loss claimed (see Ins. Policy at 0000030) and it disallowed an examination of its books and records (id.). Without evidence of a business income loss, coupled with a breach of these duties by Optica, a claim of business income loss cannot go forward.

All reasonable inferences support the conclusion that both parties sought to keep Optica in the store as long as possible, until the mold problem became unmanageable and a temporary relocation was required. Both parties benefitted from having the store continue to operate because the business income losses and expenses involved in relocating would be less. Early correspondence between Travelers and Optica indicates that the insurer acquiesced to Optica postponing an accounting of its claim till things "slow down" in January or February 2003. (See Travelers' Exh. D.) Yet, based on this record, Travelers cannot be held responsible for business income loss. This correspondence does not mean that Optica was required, or permitted to forgo it duties as the insured until some later date merely because it was allowed to postpone repairs on the darkroom. The on-site insured has an express duty under the Policy to protect, report, cooperate and mitigate its claim. (See "Duties in the Event of a Loss" at 0000030.) Optica's claims are not retroactive, so the fact that Leomporra decided to stay in the premises, in contradiction to the advice of his public adjuster and the insurer, to the eventual detriment of his business, is of no consequence to its coverage under the Policy.

---

quality. (Ins. Policy 0000014, 0000018.)

In short, the insured had a duty to preserve his property and his business, and then seek redress with the insurer by way of a claim for expenses incurred, or litigation if need be.

Nevertheless, Optica has not been presented a single financial or accounting record to Travelers, or this Court, which could substantiate a business income claim which was incurred in the twelve consecutive months following September 17, 2002.  Optica has not filed a federal business income tax claim since 1998, which raises numerous other legal issues not presently before the Court.  Without these documented losses, Travelers will prevail as a matter of law.  Therefore, summary judgment will be granted as to the business income claim.

c.  Extra Expense Claim

It is undisputed that the Policy provides coverage for the extra expense Optica actually incurred in equipping and operating a temporary location.  Similar to business income, an extra expense under the policy must be *incurred* during the period of restoration and occur within twelve consecutive months after the date of direct physical loss or damage.  (Ins. Policy 0000018.)  Like the business income analysis above, Optica has not answered Traveler's discovery requests, or submitted a factual basis for extra expenses in its cross-motion for summary judgment.

Traveler's adjuster Hartmann testified that the cost of disassembling Optica's equipment, moving, reassembly, and the rental of the temporary location were covered under the Policy.  (10/20/04 Hartmann Dep. at 50.)  Viewing the facts in the light most

favorable to Optica, it has not demonstrated that it incurred extra expenses during the period of restoration.  Summary judgment on the extra expense claim is therefore appropriate.

### 2. Consequential Damages

The New Jersey Supreme Court established the governing standard in <u>Pickett v. Lloyd's</u>, 621 A.2d 445 (N.J.1993) for when an insurance company might be liable for consequential damages beyond the policy limits based upon the insurer's bad faith failure to pay.  In order to establish a claim for bad faith in the insurance context, a plaintiff must show two elements: (1) the insurer lacked a "fairly debatable" reason for its failure to pay a claim, and (2) the insurer knew or recklessly disregarded the lack of a reasonable basis for denying the claim.  <u>Id.</u> at  454.  Plaintiff must be able to establish, as a matter of law, a right to summary judgment on the substantive claim; if plaintiff cannot establish a right to summary judgment, the bad faith claim fails.  <u>Id.</u>  In other words, if there are material issues of disputed fact which would preclude summary judgment as a matter of law, an insured cannot maintain a cause of action for bad faith.  <u>Id.</u>; <u>Tarsio v. Provident Ins. Co.</u>, 108 F. Supp. 2d 397, 400-01 (D.N.J. 2000); <u>Polizzi Meats v. Aetna Life & Cas. Co.</u>, 931 F. Supp. 328, 335 (D.N.J. 1996).

Consequential damages are not warranted here because summary judgment was granted in favor of Travelers as to the breach of contract claim.  Even assuming that analysis was in error, there was a "fairly debatable" reason for Travelers' denial of

23

Optica's claim because Traveler's received no evidence of business income loss or extra expense. Therefore, Optica's bad faith cause of action is unsustainable as a matter of law and Travelers is entitled to summary judgment.

### 3. Consumer Fraud Act

The breach of an enforceable insurance contract does not constitute a violation of New Jersey's Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-2. <u>Van Holt v. Liberty Mut. Fire Ins. Co.</u>, 163 F.3d 161 (3rd Cir. 1998). Hence, the mere denial of insurance benefits to which the plaintiffs believed they were entitled does not comprise an unconscionable commercial practice. <u>Id.</u> at 168. New Jersey courts have uniformly supported this interpretation. <u>See, e.g.</u>, <u>Kuhnel v. CNA Ins. Companies</u>, 731 A.2d 564 (N.J. Super. Ct. App. Div. 1999) ("The issues here involve the receipt of benefits, issues which have been held to be beyond the scope of the CFA."), <u>certif. denied</u>, 746 A.2d 458, <u>cert. denied</u>, 531 U.S. 819 (2000).

Here, Optica's claim centers around receipt of benefits. Accordingly, Optica's consumer fraud allegations will be dismissed insofar as they are claimed to constitute violations of the CFA.

### 4. Attorney's Fees

The federal courts and the courts of the State of New Jersey adhere to the "American Rule", which provides that the "prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." <u>Alyeska Pipeline Serv. Co. v.</u>

Wilderness Society, 421 U.S. 240, 247 (1975);  Rendine v. Pantzer, 141 N.J. 292, 322 (1995).  New Jersey Civil Rule 4:42-9(a)(6) provides an exception to this rule.  It authorizes counsel fees in "an action upon a liability or indemnity policy of insurance, in favor of a successful claimant".  Id.  This insurance policy at issue here is neither for liability nor indemnity coverage, but, rather, for first party coverage for alleged property damage to Optica's own property.  As such, plaintiff may not recover attorney's fees from Travelers.  See Cipala v. Lincoln Technical Institute, 843 A.2d 1069, 1075 (N.J. 2004); Guarantee Ins. Co. v. Saltman, 526 A.2d 731, 735 (N.J. Super. Ct. App. Div. 1987) (holding that the rule is "not extended to permit counsel fees to its insured on a direct suit against the insurer to enforce a casualty or other first party direct coverage").

Again, assuming arguendo that Optica could sustain a breach of contract claim, the New Jersey law would still foreclose Optica's claim for attorney fees.  Therefore, summary judgment will be granted in favor of Travelers because Optica is not entitled to attorney fees as a matter of law.

**5.  Common Law Fraud and Misrepresentation**

In order to establish a claim for fraud, plaintiff must demonstrate: i) a material representation of a fact, ii) knowledge on the speaker's part that the statement is false, iii) an intent that the other lied, iv) actual and reasonable reliance, and v) resulting damages. Gennari v. Weichert Co. Realtors, 691 A.2d 350, 367 (N.J. 1997)  In addition to these elements, claims of negligent misrepresentation also require reasonable reliance on the

alleged misrepresentation.  <u>In re: The Northwestern Mutual Life Insurance Company Sales Practices Ligitation</u>, 70 F. Supp. 2d 466, 468 (D.N.J. 1999) (citing to New Jersey case law).

Federal Rule of Civil Procedure 9(b) requires a plaintiff to plead fraud with particularity.  In pertinent part, Rule 9(b) states that "in all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity.  Malice, intent, knowledge and other conditions of mind of a person may be averred generally." <u>Id.</u>  The Complaint contains only a general allegation of "representations by Travelers of a prompt and fair claims process" which have "proven false and plaintiff has relied thereon to its detriment."  (Compl., ¶ 27.)  Optica provides no specific factual allegations with regard to this alleged misrepresentation and/or fraud.  Moreover, Optica's Opposition Brief does nothing more than articulate the black letter law without offering one fact to support its fraud and misrepresentation claims.

A plaintiff may not rely on conclusory statements in order to establish a fraud claim.  <u>Mardini v. Vicking Freight, Inc.</u>, 92 F. Supp. 2d 378, 385 (D.N.J. 1999).  Rather, it must at least, indicate who made the material misrepresentation giving rise to the claim, and what representations were made.  <u>Id.</u>  Because Optica makes no specific factual allegations of misrepresentation and reliance thereon, it is appropriate under Fed. R. Civ. P. 9(b) to grant summary judgment as to these claims.

**B.     Claims against the Metro Defendants**

**1. Breach of Contract**

On or about February 12, 2003, Optica entered into a contract with Metro to serve as an adjuster in its preparation of its insurance claim.  (Compl. at 5.)  The Public Adjuster Retainer Agreement states that, "[Optica] engages Metro to advise and assist in the adjustment of an insurance claim."  (Metro, Exh. H.)  On August 24, 2003, Leomporra wrote DeCecco in an attempt to terminate the Retainer Agreement.  (Metro, Exh. GG.)  Leomporra indicated that he believed that he was entitled to a refund of the monies paid to Metro as part of a retainer.  (Id.)  The record does not indicate how much Optica paid Metro for its retainer.  On September 3, Metro's vice-president Young wrote to Leomporra to indicate that he would not accept Optica's termination of the contract and stated:

> I am unable to grant your request for termination of the Contract with a return of the fee paid to our firm.  A review of the Contract between yourself and Metro Public Adjustment shows that your right to cancel must be invoked within three business days of signing such.  Your request is not within the time limit allowed.

(Compl. ¶ 20; Compl. at Exh. 3.)

Optica devotes significant attention to "Breach of Contract" in its Opposition to Metro's Motion for Summary Judgment.  However, Metro has not moved for summary judgment as to Optica's breach of contract claim.  Metro's Brief does not specifically address this claim despite the request in its Motion to "dismiss all claims."  (See Metro

Br. at 39.)  Furthermore, Optica only filed a cross-motion for summary judgment as against Travelers as it relates to a breach of contract claim.  As a result, Optica's breach of contract claim against Metro is not being challenged, and therefore, is undisturbed by this Court's Opinion and accompanying Order.

### 2.  Breach of covenant of good faith and fair dealing

An implied duty of good faith and fair dealing is implied into all contracts in New Jersey.  Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575 (N.J. 1997) (citing cases).  The New Jersey Supreme Court explained the duty as requiring that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Id. (quoting Palisades Props., Inc. v. Brunetti, 207 A.2d 522 (N.J. 1965)).  The implied covenant is an independent duty and may be breached even where there  is no breach of the contract's express terms.  See Sons of Thunder, 690 A.2d at 588 (citing Bak-A-Lum Corp. v. Alcoa Bldg. Prods., Inc. 351 A.2d 349 (N.J. 1976)).

Despite Optica's breach of contract claim, this allegation is not duplicative, and therefore, warrants an independent analysis under New Jersey law.  See Automated Salvage Transp., Inc. v. NV Koninklijke KNP BT, 106 F. Supp. 2d 606 (D.N.J. 1999)  Optica does not directly respond to Metro's argument concerning Metro's alleged breach of the covenant of good faith and fair dealing in its Brief.  Optica, however, under the heading "Breach of Contract" avers that Metro did "next to nothing for the seven months

it was retained by Optica, other than relay letters between Travelers and Optica." (Optica Opp. Br. to Metro at 8.) Also, Optica submits that Metro failed to request adequate advances, and advise Optica on when the one-year "Business Interruption" period began under the Insurance Contract. (Id.) Additionally, and not given consideration here, Optica makes the bald assertion that Metro colluded with Travelers in delaying its claim. Such allegations are distinct from its breach of contract claim; thus, it may "not literally violate" the agreement; it may, however, violate the covenant.

Indeed, drawing all favorable inferences in favor of the non-movant, Optica, there exists a genuine issue of material fact as to whether Metro's actions "injured [Optica's] right . . . to receive the fruits of the contract." Pallisades Properties, Inc., 44 N.J. at 130. In particular, there is significant dispute of the role that Metro played in resolving Optica's claim. Importantly, there were several documents sent by way of the adjuster to the insurer that were incorrect. Metro's involvement since February 2003 calls into question how and why Optica failed to take advantage of the business income and extra expense provisions of the contract during the period of restoration once the licensed adjuster was retained. The factual record is inconclusive on whether this was the result of the insured or the adjuster, or both. Accordingly, the Court will deny summary judgment as to that claim.

### 3. Common law fraud and misrepresentation

The Metro Defendants have moved to dismiss the fraud and misrepresentation

claims against them on the grounds that Optica has not plead the sufficient quantum of facts to survive a motion for summary judgment.  (Metro Br. at 26.)  This argument is unopposed in Optica's Opposition Brief.  The analysis employed in Part II.A.5, infra, in dismissing the same claims against Travelers is applicable here.

Federal Rule of Civil Procedure 9(b) requires a plaintiff to plead fraud and misrepresentation claims with particularity.  In pertinent part, Rule 9(b) states that "in all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity.  Malice, intent, knowledge and other conditions of mind of a person may be averred generally."  Id.  Optica states that DeCecco and Young represented that Metro was a "knowledgeable experienced public adjuster who would promptly process information necessary to have an orderly transition from the damaged facility to the new facility within the timeframes of the Insurance Contract which provides for a 12-month coverage of business interruption losses."  (Compl., ¶ 16.)  Further, the Complaint contains only a general allegation that "Plaintiff has relied upon the various representations and misrepresentations to its detriment."  (Compl., ¶ 21.)  Neither Optica's Complaint, or the papers opposing Metro's motion, provide specific factual allegations with regard to this alleged misrepresentation and/or fraud.  Because Optica makes no specific factual allegations of fraud and/or misrepresentation and reliance thereon, it is appropriate under Fed. R. Civ. P. 9(b) to grant summary judgment as to these claims.

### 4. Consumer Fraud Act claims

This case involves claims made by a business owner against its adjuster due to alleged failures in processing the insured's claim with the insurer.  The CFA and New Jersey's jurisprudence provide a plethora of examples of what does or does not amount to consumer fraud.  Minor disagreements between consumer and business owner over quality of customer service, timing of service, or increased price is not consumer fraud. Turf Lawnmower Repair v. Bergen Record Corp., 655 A.2d 417, 430 (N.J. 1995).  To constitute consumer fraud sufficient to trigger the actual-malice standard, the business practice in question must be "misleading" and stand outside the norm of reasonable business practice in that it will victimize the average consumer, and thus most clearly and directly involve a matter of legitimate public concern.  Id.  New Jersey recognizes a distinction between consumer fraud and mere customer dissatisfaction.  Id.

In drawing all reasonable inferences, the evidence that Optica introduces does not set forth consumer fraud conduct that would constitute a violation of the CFA.  Metro and Optica entered into a private contract for services.  This litigation concerns the quality of the service provided.  While professional adjusters might arguably involve "a matter of legitimate public concern," the facts provided in the Complaint and Metro's supporting papers do not create a genuine issue of material fact as to whether Metro engaged in an "unlawful practice" under the CFA.[3]  An isolated contract dispute is not the evil the state

------

[3]  The focus of the CFA is the activity of a corporation that constitutes an "unlawful practice."  For example, N.J.S.A. 56:8-2, dealing with fraud in connection with sale or

legislators envisioned went it drafted the CFA.  Therefore, summary judgment will be granted as to this claim.

### 5. Negligence Claim

Under New Jersey law, three elements are essential for the existence of a cause of action in negligence: (1) a duty of care owed by defendant to plaintiff; (2) a breach of that duty by defendant; and (3) an injury to plaintiff proximately caused by defendant's breach. Endre v. Arnold, 692 A.2d 97, 100 (N.J. Super. Ct. App. Div. 1997) (citation omitted). The determination of the existence of a duty is a question of law for the court.  Petrillo v. Bachenberg, 655 A.2d 1354, 1357 (N.J. 1995) (citations omitted).  The question whether a duty exists implicates many factors, including the foreseeability of harm, fairness and public policy.  Carvalho v. Toll Bros. and Developers, 675 A.2d 209, 212(N.J. 1996). Foreseeability as it impacts duty determinations refers to:

> [t]he knowledge of the risk of injury to be apprehended.  The risk reasonably to be perceived defines the duty to be obeyed; it is the risk

---

advertisements by merchants, reads:

> [t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such . . . whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice. . . .

The phrase "unconscionable commercial practice" is not defined in the Act.  Acknowledging that "unconscionability"is an "amorphous concept obviously designed to establish a broad business ethic," the New Jersey Supreme Court has defined the term as "the standard of conduct contemplating * * * good faith, honesty in fact and observance of fair dealing." Meshinsky v. Nichols Yacht Sales, Inc., 541 A.2d 1063 (1988) (quotation omitted).

> reasonably within the range of apprehension, of injury to another person,
> that is taken into account in determining the existence of the duty to
> exercise care.

Kuehn v. Pub Zone, 835 A.2d 692, 698 (N.J. Super. Ct. App. Div. 2003).  The last

element of negligence concerns damages, which have traditionally been limited to actual

physical injury to persons or property.

New Jersey, however, has generally rejected a per se "economic loss" doctrine and

has endeavored to create exceptions to this rigid rule when the plaintiffs are reasonably

foreseeable, the injury is directly and proximately caused by defendant's negligence, and

liability can be limited fairly.  People's Express Airlines Inc. v. Consolidated Rail., 495

A.2d 107, 109 (N.J. 1985).  Generally, to recover for an economic loss resulting from

negligence by one furnishing a service, a "direct contractual relationship between the

parties" must exist or the injured party must be a known "beneficiary of the defendant's

undertaking."  H. Rosenblum, Inc. v. Adler, 461 A.2d 138, 143 (N.J. 1983).  Such

contract existed between Metro and Optica; therefore, a duty was owed.

Metro correctly asserts that Optica has failed to proffer a genuine issue of material

fact to a sustain a negligence claim because Optica has not submitted any evidence

indicating that Metro, a licensed public adjuster, breached its duty to Optica.  New Jersey

has established a standard to determine whether expert testimony is required for a

particular subject matter.  Generally, subject matter that is so esoteric that it is beyond the

ken of the average person typically qualifies as an appropriate subject for expert

testimony.  State v. Kelly, 478 A.2d 364 (N.J. 1984).  A factfinder should not be allowed to speculate without the assistance of expert testimony in an area where the average person could not be expected to have sufficient knowledge or experience.  Kelly v. Berlin, 692 A.2d 552 (N.J. Super. App. Div. 1997).

Expert testimony is generally required to establish a standard of care in a professional liability case.[4]  There exists exceptions to the expert testimony requirement where the questioned conduct presents such an obvious breach of an equally obvious professional norm that the fact-finder could resolve the dispute based on its own ordinary knowledge and experience and without resort to technical or esoteric information.  Brach, Eichler, Rosenberg, et al v. Ezekwo, 783 A.2d 246 (N.J. Super. Ct. App. Div. 2001).  The exception does not apply here because the conduct at issue cannot be said to be "such an obvious breach."  The standard of care of a public adjuster would likely require analysis of standard industry practices, including the use and application of claims forms, risk and exposure assessments, and contract interpretation.  Because Optica's predicate for liability as asserted in the Complaint is the manner in which a "licensed person," an adjuster, exercised responsibilities and judgment, and because the circumstances under which the deficiencies occurred, if indeed they did occur, is not a matter within the

---

[4]  See, e.g., Sanzari v. Rosenfeld, 167 A.2d 625 (N.J. 1961) (medical malpractice); Rosenberg v. Cahill, 492 A.2d 371 (N.J. 1985) (legal malpractice);  Taylor v. DeLosso, 725 A.2d 51 (N.J. Super. Ct. App. Div. 1999) (Architect malpractice);  Charles A. Manganaro Consulting Eng'rs v. Carneys Point Twp., 781 A.2d 1116 (N.J. Super. Ct. App. Div. 2001) (engineering malpractice);  Dimarino v. Wishkin, 479 A.2d 444 (N.J. Super. Ct. App. Div. 1984) (Insurance broker malpractice).

knowledge of the average citizen or juror, Optica would need an expert in order to make out a prima facie case before the jury.

Expert testimony has not been proffered; therefore, Optica's claim for professional negligence must fail because there are no genuine issues of material fact as to the breach of standard of care.  Accordingly, summary judgment will be granted as to this claim.

## VI.  Conclusion

For the reasons discussed herein, summary judgment will be granted as to all claims against Travelers, and therefore, Optica's cross-motion for summary judgment will be denied in its entirety.  Metro's motion for summary judgment will be granted in-part and denied in-part.  Optica's claims of fraud, misrepresentation, consumer fraud, and negligence as against the Metro Defendants will be dismissed.  The Metro Defendants' motion for summary judgment will be denied as to Optica's breach of contract and breach of the covenant of good faith and fair dealing claims.  The accompanying Order is entered.


/S/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
Dated: July 21, 2005                    United States District Judge